## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**JEFFREY LEWIS #560525**                                    **CIVIL ACTION**

**VERSUS**                                                          **NO. 19-10529**

**DARREL VANNOY, WARDEN**                          **SECTION: "F"(1)**

### REPORT AND RECOMMENDATION

Petitioner, Jeffrey Lewis,[1] a Louisiana state prisoner, filed this federal habeas corpus application seeking relief pursuant to 28 U.S.C. § 2254.  For the following reasons, it is recommended that his application be **DISMISSED WITH PREJUDICE**.

On November 30, 2011, petitioner was convicted of second degree murder under Louisiana law.[2]  On February 10, 2012, he was sentenced to a term of life imprisonment without benefit of probation, parole, or suspension of sentence.[3]  The Louisiana Fourth Circuit Court of Appeal affirmed his conviction and sentence on September 25, 2013,[4] and the Louisiana Supreme Court denied his related writ application on June 20, 2014.[5]

In March of 2015, petitioner filed with the state district court an application for post-conviction relief asserting three claims.[6]  Two of those claims were summarily denied on

---

[1] Petitioner's first name appears in the record as both "Jeffrey" and "Jeffery."
[2] State Rec., Vol. 3 of 9, transcript of November 30, 2011, p. 296; State Rec., Vol. 7 of 9, minute entry dated November 30, 2011.
[3] State Rec., Vol. 4 of 9, transcript of February 10, 2012; State Rec., Vol. 7 of 9, minute entry dated February 10, 2012.
[4] State v. Lewis, 125 So. 3d 1252 (La. App. 4th Cir. 2013); State Rec., Vol. 7 of 9.
[5] State v. Lewis, 141 So. 3d 279 (La. 2014); State Rec., Vol. 7 of 9.
[6] State Rec., Vol. 7 of 9.

December 14, 2016,[7] and, after an evidentiary hearing, the remaining claim was denied on October 6, 2017.[8]  His related writ applications were then likewise denied by both the Louisiana Fourth Circuit Court of Appeal on February 15, 2018,[9] and the Louisiana Supreme Court on April 8, 2019.[10]

In May of 2019, petitioner filed the instant federal habeas corpus application.[11]  The state filed a response conceding that the application was timely and that the claims were exhausted and not procedurally defaulted; however, the state argued that the claims had no merit.[12]  Petitioner filed a reply.[13]

## I.  Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  Bell v. Cone, 535 U.S. 685, 693 (2002); accord Langley v. Prince, 926 F.3d 145, 155 (5th Cir. 2019) (noting that the AEDPA imposes a "relitigation bar" on claims adjudicated on the merits by the state court), cert. denied, No. 19-6413, 2020 WL 1906607 (U.S. Apr. 20, 2020).  The applicable standards of review are now as follows.

As to pure questions of fact, factual findings are presumed to be correct and a federal court must give deference to the state court's decision unless it "was based on an unreasonable

---

[7] State Rec., Vol. 7 of 9, Judgment dated December 14, 2016.
[8] State Rec., Vol. 7 of 9, Judgment dated October 6, 2017.
[9] State v. Lewis, No. 2018-K-0039 (La. App. 4th Cir. Feb. 15, 2018); State Rec., Vol. 8 of 9.
[10] State v. Lewis, 267 So. 3d 59 (La. 2019); State Rec., Vol. 9 of 9.
[11] Rec. Doc. 1.
[12] Rec. Doc. 14.
[13] Rec. Doc. 15.

determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases. A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (footnotes, internal quotation marks, ellipses, and brackets omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has held: "[A] state-court decision is an unreasonable application of our clearly established precedent

if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case." White v. Woodall, 572 U.S. 415, 426 (2014). However, a federal habeas court must be mindful that "an unreasonable application is different from an incorrect one." Bell, 535 U.S. at 694; accord Harrington v. Richter, 562 U.S. 86, 102-03 (2011) ("Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." (quotation marks omitted)); Langley, 926 F.3d at 156 ("The Supreme Court has repeatedly held that it is not enough to show the state court was wrong."); Puckett v. Epps, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").

Therefore:

> "[T]he [AEDPA's] relitigation bar forecloses relief unless the prisoner can show the state court was *so* wrong that the error was well understood and comprehended in existing law beyond any possibility for fairminded disagreement. In other words, the unreasonable-application exception asks whether it is beyond the realm of possibility that a fairminded jurist could agree with the state court.

Langley, 926 F.3d at 156 (citations and quotation marks omitted). "Under AEDPA's relitigation bar, the very existence of reasonable disagreement forecloses relief." Id. at 170.

Further, the Supreme Court has expressly cautioned:

> Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error. Thus, if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision. AEDPA's carefully constructed framework would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.

Woodall, 572 U.S. at 426 (citations and quotation marks omitted).  Therefore, when the Supreme

Court's "cases give no clear answer to the question presented, let alone one in [the petitioner's]

favor, it cannot be said that the state court unreasonably applied clearly established Federal law."

Wright v. Van Patten, 552 U.S. 120, 126 (2008) (quotation marks and brackets omitted).

In summary, "AEDPA prevents defendants – *and federal courts* – from using federal

habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts."

Renico v. Lett, 559 U.S. 766, 779 (2010) (emphasis added).  The Supreme Court has expressly

warned that although "some federal judges find [28 U.S.C. § 2254(d)] too confining," it is

nevertheless clear that "all federal judges must obey" the law and apply the strictly deferential

standards of review mandated therein.  Woodall, 572 U.S. at 417.

## II.  Facts

Petitioner and his brother, Christopher Lewis, were indicted for the second degree murder

of Jamal Harris and tried separately.  Petitioner was convicted as charged and appealed.  On appeal,

the Louisiana Fourth Circuit Court of Appeal summarized the facts and trial testimony in his case

as follows:

> Terrell Harris testified that he was sixteen years old at the time of the
> shooting and that the victim was a friend of his.  They had been introduced to each
> other by the defendant and Christopher Lewis.
> Harris recounted that on October 19, 2009, Kashunda Jones and the
> defendant picked him up, and they drove to the home of Monique and Brianna Allen
> around Columbia Street in New Orleans between 1:00 and 2:00 p.m.  He explained
> that Monique and Brianna Allen were the cousins of Christopher Lewis and the
> defendant.
> Harris testified that the victim arrived at the location in a truck a few
> minutes after he himself arrived.  Harris recounted that he and the victim "messed
> around/played," and the victim poked Harris in the eye.  The defendant told the
> victim:  "You are going to stop messing with my little partner."  The victim and the
> defendant were about to fight when the victim said:  "Man, let me get my issue,"
> and ran out of the house.  The defendant, armed with a black .45 caliber gun, ran

after the unarmed victim.  After the defendant ran out of the house, Christopher Lewis and Harris, each armed with their own gun, ran outside.  Harris testified that he was standing next to the defendant when the defendant shot the victim.  When the victim fell, Harris shot him.  Christopher Lewis took Harris' gun from him, telling him, "You don't know what you are doing" and Christopher Lewis proceeded to shoot the victim.  Harris further testified that the defendant fired fifteen shots and Christopher Lewis fired ten shots.  Harris testified that the defendant and Christopher Lewis had given him the gun he had at the time of the murder.

Additionally, Harris testified that Brianna Allen removed the victim's cell phone from his pocket, and he, Christopher Lewis, and the defendant jumped into a car driven by Kashunda Jones and drove away.  The defendant and Christopher Lewis put their guns into a backpack.  Harris never saw the guns again.  Harris testified that he left the others and went home.

Harris further recounted that the following morning, the police arrested him at his mother's house and transported him to headquarters.  In the presence of his mother, he was <u>Mirandized</u>, waived his rights and gave a recorded statement, a portion of which was played for the jury.  After he made the statement, homicide Det. Anthony Pardo ("Det. Pardo") presented him with photo lineups from which Harris identified the defendant, Christopher Lewis and Kashunda Jones.  Thereafter, Harris was charged with second-degree murder and transferred to juvenile jail.

Harris testified that approximately two years after the shooting, he and his mother met with someone from the District Attorney's office, who told Harris that he if told the truth at the defendant's trial, he would be charged in Juvenile Court with manslaughter.  Subsequent to signing the agreement with the District Attorney's office, Harris met with and explained to the prosecutors what happened to the victim.

During his trial testimony, Harris viewed State's Exhibits 94A and 94B, pictures of Christopher Lewis and the defendant holding guns.  Harris said that the guns in the pictures looked like the gun the defendant had at the time of the shooting.

Brianna Allen testified that at the time the victim was shot, she and her sisters, Monique and Tonika,[FN 2] resided at 1251 Columbus Street near Marais Street.  She stated that the day of the shooting she was at her home with the defendant, Christopher Lewis and several other family members.  She heard gunshots and then noticed the defendant and Christopher Lewis standing in the front door with guns in their hands.  She did not see the shooting and did not know whether the victim had a gun at that time.  Brianna Allen said that immediately after hearing the gunshots, she went outside where family members and others had gathered.  When she realized that the victim was dead, she sat next to his body.

[FN 2]  Tonika Allen was called by the State as a witness, but she invoked her Fifth Amendment privilege, refusing to answer any questions.  However, the trial

6

court allowed the State to play for the jury her statement, State Exhibit 105, which
she gave to the police immediately after the shooting.

In addition to family members and neighbors who gathered after the
shooting, Brianna Allen testified that she noticed Harris jumping up and down in
the crowd obviously excited and shouting that he had shot the victim in the head.

Brianna Allen recalled speaking to the police that day and giving them a
recorded statement at the police station. To refresh Brianna Allen's memory, the
State played portions of her recorded statement. However, when questioned about
the guns and what she said the defendant said to her after the shooting, Brianna
Allen said she lied about that information because she was mad at the defendant,
who is her cousin.

Lisa Thornton testified that her job as an investigator with the Orleans
Parish District Attorney's Office requires her to locate witnesses and speak with
victims. During the course of her employment, Ms. Thornton spoke with Brianna
Allen on October 5, 2011, in the presence of the prosecutors in the District
Attorney's office. At the meeting, the prosecutors played Brianna Allen's recorded
statement, but she recanted everything she had said in her statement. Ms. Thornton
further related that Brianna Allen said that on the day of the shooting, both the
defendant and Christopher Lewis had guns. Brianna Allen further indicated that
the defendant called her a "ho" because "she was worried about someone that
wasn't even related to them." Ms. Thornton recalled that after Brianna Allen
recanted her statement, she explained that she was nervous and scared about
testifying against a family member. However, Ms. Thornton explained that at no
time did Brianna Allen say that what she said to the police was a lie.

Verlena Wilson, the victim's mother, testified that the victim was twenty
years old at the time of his death. Ms. Wilson testified that the victim introduced a
woman named "Gabby" to her as his girlfriend, and he told Ms. Wilson that Gabby
was pregnant with his child. Ms. Wilson further testified that she knew that the
defendant and Christopher Lewis were Gabby's brothers and friends of the victim.
Mrs. Wilson recounted that the victim lived with Gabby, the defendant and
Christopher Lewis at the Lewis residence from April to July 2009. However, he
moved out of the Lewis house prior to his death because of a falling out with the
defendant and Christopher.

Off. Hilary Hunt of the New Orleans Police Department testified that on
October 19, 2009, at approximately 12:45 p.m., she and her partner, Off. Neka
Beechem, responded to a call of gunfire in the 1500 block of Marais Street. At the
scene, Off. Hunt observed the non-responsive victim lying face down on the ground
in a puddle of blood in front of the 1512 Marais Street residence. Off. Hunt testified
that she and Off. Beechem were the first officers on the scene. Off. Hunt initiated
a major crime sign-in sheet, cordoned off the area and called for EMS. Medical
personnel attempted to revive the victim, but to no avail, and the victim was
pronounced dead at the scene. Off. Hunt's participation in the investigation of this

case ended when the crime scene technicians arrived.  She turned over the scene to a Det. Sosa.[FN 3]

[FN 3]  Det. Sosa's full name is not contained within the record.

Det. Pardo was the lead detective on this case.  He testified that he and his partner, Det. Wischan,[FN 4] reported to the scene.  Det. Pardo recounted that he assessed the scene and delegated certain police personnel to canvas the area, notify family members and the crime lab and supervise collection of evidence.  The inspection of the crime scene, which was approximately one-half block in length, yielded a number of spent bullet casings and fired bullets – .45 caliber and 9 mm ammunition.  The casings and bullets were found in close proximity to the victim's body on the sidewalk.  Det. Pardo testified that he directed Detectives Kevin Burns and Melanie Dillon to interview witnesses/sisters, Brianna and Tonika Allen, who were at 1251 Columbus Street.  Both of the sisters were transported to police headquarters to give statements.  Det. Pardo testified that he took a statement from Tonika Allen.  Det. Christopher Harris secured a search warrant for 1251 Columbus Street.  After speaking with the witnesses, he obtained arrest warrants for the defendant, Christopher Lewis and Terrell Harris for second-degree murder and for Kashunda Jones as an accessory after the fact for driving the subjects away from the scene.

[FN 4]  Det. Wischan's full name is not contained within the record.

Det. Pardo further recounted that Christopher Lewis and Kashunda Jones were arrested in Jefferson Parish at the home of the defendant's mother, Ms. Lewis.  Ms. Lewis consented to her residence being searched, and as a result eleven photographs, a social security card in the defendant's name, one plastic bag containing four live 9 mm rounds, one Winchester 12-gauge shotgun shell, two cell phones, a gun cleaning kit, a shoe box, one Enterprise car rental agreement and one backpack containing Halloween masks were recovered from her residence.  Det. Pardo testified that the 9 mm bullets taken from Ms. Lewis' house were consistent with the 9 mm brand of bullets fired at the scene.  The Enterprise car rental agreement bore the name Amelia Lewis and was for the rental of the 2009 Chevy Malibu, which, Det. Pardo testified, was the vehicle used by Kashunda Jones to drive the suspects away from the shooting scene.  The vehicle was searched pursuant to warrant, but nothing was confiscated.

Lastly, Det. Pardo testified that the defendant was arrested in Algiers at a residence on Newton Street, which was searched pursuant to a warrant.  However, no evidence was recovered.

Det. Kevin Burns received a call on October 19, 2009, from Sgt. Catalanotto[FN 5] about a homicide in the Columbus/Marais Street area.  Det. Burns met with Tonika and Brianna Allen, who were witnesses at the scene of the shooting.  Det. Burns testified that from his conversation with them, he developed

the names of the suspects.  Det. Burns testified that he compiled three photographic lineups, which he displayed for the witnesses.  However, before displaying the lineups, he and Det. Melanie Dillon obtained two recorded statements from Brianna Allen on the day of the shooting.  Brianna Allen identified the photo of the defendant (number 5) from one of the lineups as one of the men she saw holding a gun, and from the other lineup, Brianna Allen identified photo number 3 as the picture of the co-perpetrator.  From the third photo lineup, Brianna Allen identified photo number 1 as the third suspect.

[FN 5] Sgt. Catalanotto's full name is not contained in the record.

Aven Cooper, a fifteen-year veteran of the NOPD as a crime scene technician and forensic examiner, defined her responsibilities as photographing crime scenes, collecting evidence and dusting for fingerprints. Ms. Cooper testified that she remembered examining the crime scene on Marais Street the day of the shooting.  She obtained direction from one of the investigating officers as to what evidence, examinations, photos, sketches, etc., were needed. She explained to the jury the contents of the photographs taken at the scene.  Further, Ms. Cooper indicated that her report listed that four copper fragments, eight spent .45 caliber casings, seven spent Winchester 9 mm Luger casings, one live 9 mm Luger cartridge and a live WCC-80 cartridge were collected from the scene.  All of the live and spent bullets along with the casings were deposited into Central Evidence and Property.

Now retired Sgt. Byron Winbush was qualified by stipulation as an expert in firearms examination and ballistics.  The sergeant testified at length about the testing protocol employed to identify types of firearms and ammunition and procedures used to link them to evidence from a particular crime.  Sgt. Winbush verified that he performed ballistics testing in this case and produced a report of his findings dated February 13, 2010, under item number J-26603-09.  He tested four .45 caliber bullets, one .45 caliber copper jacket, eleven .45 caliber cartridge cases, seven 9 mm cartridge cases and two unknown caliber copper bullet jackets, all of which were recovered from the shooting scene.  From his testing, Sgt. Winbush determined that all of the .45 caliber cartridge cases and five .45 caliber bullets were fired from the same unknown .45 caliber weapon.  Also, the seven 9 mm cartridge cases were fired from the same unknown 9 mm weapon.  Lastly, Sgt. Winbush testified that no weapons were recovered in this case.

Dr. Richard Tracy performed the autopsy on the victim's body and determined that the victim suffered two fatal gunshot wounds to the heart.  The doctor also testified that test results on the victim's blood for commonly used street drugs and alcohol were negative.

Don Hancock testified that in his position with the Orleans Parish Sheriff's Office he oversaw the operations of the telecommunications systems at the Orleans Parish jail, including the inmate phone system.  Mr. Hancock explained that each inmate is assigned a folder number which enables the system to track and record all

inmate calls.  Mr. Hancock identified State's Exhibit 103 as a call placed by the defendant while incarcerated.  The call was played for the jury.[14]

### III.  Petitioner's Claims[15]

### A. The Prosecutor Knowingly Presented False Testimony at Trial

Petitioner claims that the prosecutor knowingly presented false testimony from Terrell Harris at trial.  The state district court denied that claim without assigning reasons,[16] as did the Louisiana Fourth Circuit Court of Appeal.[17]  The Louisiana Supreme Court then likewise denied relief, stating simply, "[A]pplicant fails to satisfy his post-conviction burden of proof.  La.C.Cr.P. art. 930.2."[18]

A claim of prosecutorial misconduct, including the use of false testimony, presents a mixed question of law and fact.  Eaglin v. Louisiana, No. 19-9659, 2020 WL 475770, at *28 (E.D. La. Jan. 7, 2020), adopted, 2020 WL 474923 (E.D. La. Jan. 29, 2020); Harvey v. Cain, Civ. Action No. 13-2994, 2013 WL 6490484, at *5 (E.D. La. Dec. 10, 2013).  Therefore, to obtain federal relief, petitioner must show that the state court's decision denying this claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  For the following reasons, the Court finds that he has not made that showing.

It is true that due process may be violated if a prosecutor knowingly presents false testimony at trial or allows untrue testimony to go uncorrected.  Giglio v. United States, 405 U.S. 150, 153 (1972); Napue v. Illinois, 360 U.S. 264, 269 (1959).  However, in order to prevail on

---

[14] State v. Lewis, 125 So. 3d 1252, 1255-58 (La. App. 4th Cir. 2013); State Rec., Vol. 7 of 9.
[15] For ease of analysis, petitioner's claims are discussed in a different order than listed in the petition.
[16] State Rec., Vol. 7 of 9, Judgment dated December 14, 2016.
[17] State v. Lewis, No. 2018-K-0039 (La. App. 4th Cir. Feb. 15, 2018); State Rec. Vol. 8 of 9.
[18] State v. Lewis, 267 So. 3d 59 (La. 2019); State Rec., Vol. 9 of 9.

such a claim, a petitioner "must show 1) the testimony was actually false, 2) the state knew it was false, and 3) the testimony was material." Canales v. Stephens, 765 F.3d 551, 573 (5th Cir. 2014) (quotation marks omitted); accord Devoe v. Davis, 717 F. App'x 419, 426 (5th Cir. 2018).

Here, although he contends that Terrel Harris committed perjury at trial, petitioner has never produced any evidence establishing that Harris's testimony was actually false, much less produced any evidence showing that the prosecutor knew it was false. Therefore, his claim necessarily fails. See, e.g., Cook v. Terrell, Civ. Action Nos. 07-8675 and 07-9226, 2008 WL 906307, at *7 (E.D. La. Mar. 31, 2008).

Further, to the extent that petitioner is arguing that Harris was induced to testify falsely in exchange an undisclosed deal for leniency with respect to his role in the crime, that issue was covered at trial. During Harris's testimony, he acknowledged that, initially, he was also charged with second degree murder in this case.[19] However, he said that the district attorney then offered him a deal in which, in exchange for testifying truthfully against petitioner and Christopher Lewis, Harris would be prosecuted only in juvenile court for the lesser crime of manslaughter. He stated that he accepted that deal.[20] After that testimony, the following exchange then also occurred between the prosecutor and Harris:

> Q.    And have you been offered anything else besides that in exchange for your testimony today?
>
> A.    No.
>
> Q.    And you know right now you have other pending charges, correct?
>
> A.    Yes.

---

[19] State Rec., Vol. 3 of 9, transcript of November 30, 2011, p. 133.
[20] Id. at pp. 133-134; see also id. at p. 146.

> Q.    And have you ever been offered anything on those charges in exchange for your testimony today?
>
> A.    No.[21]

Later in his testimony, Harris acknowledged that he had subsequently been arrested on unrelated charges concerning a drug offense, simple robbery, and a gun charge; however, he again testified that he had never been offered any deals in those cases in exchange for his testimony at petitioner's trial.[22]

To summarize:  Petitioner has presented no evidence whatsoever showing either that Harris testified falsely with respect to the events involving the instant crime or that the prosecutor knew Harris was committing perjury.  Petitioner also has presented no evidence that Harris testified falsely concerning either his favorable deal with respect to the instant crime or the absence of deals with respect to his other criminal charges.  Simply put, petitioner has not established that Harris testified falsely in any respect or that he was the beneficiary of any undisclosed deals with the prosecutors.

Therefore, petitioner clearly has not established that the state court's decision denying this claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1). Accordingly, this claim should be denied.

## B.  Ineffective Assistance of Counsel

Petitioner also claims that he received ineffective assistance of counsel both at trial and on appeal.  The state district court summarily denied the claim concerning appellate counsel without

---

[21] Id. at p. 134.
[22] Id. at pp. 188-89.

assigning reasons but scheduled an evidentiary hearing on the claim concerning trial counsel.[23] After the evidentiary hearing, the district court likewise denied that claim, holding that petitioner "ha[d] not borne his burden of proof."[24]  The Louisiana Fourth Circuit Court of Appeal then denied his related writ application without assigning reasons.[25]  The Louisiana Supreme Court thereafter likewise denied relief, stating simply, "Applicant fails to show that he received ineffective assistance of counsel under the standard of <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)."[26]

Because an ineffective assistance of counsel claim presents a mixed question of law and fact, this Court must defer to the state court decision rejecting such a claim on the merits unless the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); <u>Moore v. Cockrell</u>, 313 F.3d 880, 881 (5th Cir. 2002).  Further, the United States Supreme Court has explained that, under the AEDPA, federal habeas corpus review of an ineffective assistance of counsel claim is in fact *doubly* deferential:

> The pivotal question is whether the state court's application of the <u>Strickland</u> standard was unreasonable.  This is different from asking whether defense counsel's performance fell below <u>Strickland</u>'s standard.  Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a <u>Strickland</u> claim on direct review of a criminal conviction in a United States district court.  Under AEDPA, though, it is a necessary premise that the two questions are different.  For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law.  A state court must be granted a deference and latitude that are not in operation when the case involves review under the <u>Strickland</u> standard itself.
>
> A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the

---

[23] State Rec., Vol. 7 of 9, Judgment dated December 14, 2016.

[24] State Rec., Vol. 7 of 9, Judgment dated October 6, 2017.

[25] <u>State v. Lewis</u>, No. 2018-K-0039 (La. App. 4th Cir. Feb. 15, 2018); State Rec. Vol. 8 of 9.

[26] <u>State v. Lewis</u>, 267 So. 3d 59 (La. 2019); State Rec., Vol. 9 of 9.

state court's decision. <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." <u>Ibid.</u> "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." <u>Knowles v. Mirzayance</u>, 556 U.S. ____, ____, 129 S.Ct. 1411, 1413-14, 173 L.Ed.2d 251 (2009) (internal quotation marks omitted).

<u>Harrington v. Richter</u>, 562 U.S. 86, 101 (2011) (citation omitted). The Supreme Court then

explained:

> Surmounting <u>Strickland</u>'s high bar is never an easy task. An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the <u>Strickland</u> standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence. The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.
>
> Establishing that a state court's application of <u>Strickland</u> was unreasonable under § 2254(d) is all the more difficult. *The standards created by <u>Strickland</u> and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.* The <u>Strickland</u> standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under <u>Strickland</u> with unreasonableness under § 2254(d). *When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard.*

<u>Id.</u> at 105 (emphasis added; citations omitted). Therefore, on a habeas review of an ineffective

assistance claim, "federal courts are to afford *both* the state court *and* the defense attorney the

benefit of the doubt." <u>Woods v. Etherton</u>, 136 S. Ct. 1149, 1151 (2016) (emphasis added; quotation

marks omitted). For the following reasons, the Court finds that, under those stringently deferential

standards, it simply cannot be said that relief is warranted with respect to petitioner's ineffective assistance of counsel claims.

As the state court correctly held, the clearly established federal law with respect to such ineffective assistance of counsel claims was set forth by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984). For relief to be granted on such claims, Strickland requires that a petitioner show both that counsel's performance was deficient and that the deficient performance prejudiced his defense. Id. at 697.

To prevail on the deficiency prong of the Strickland test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment. See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001). "Counsel's performance is deficient if it falls below an objective standard of reasonableness." Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998). Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances. See Strickland, 466 U.S. at 689. "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (quoting Strickland, 466 U.S. at 690). The petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation. See Crockett v. McCotter, 796 F.2d 787, 791 (5th Cir. 1986); Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

The appropriate standard for determining prejudice varies slightly depending on whether a petitioner is challenging the actions of trial or appellate counsel. In order to prove prejudice with respect to trial counsel, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

15

Strickland, 466 U.S. at 694.  In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.  In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial."  Crockett, 796 F.2d at 793.  On the other hand, to prove prejudice with respect to a claim that appellate counsel was ineffective, a petitioner must show a reasonable probability that he would have prevailed on appeal but for his counsel's deficient representation.  Briseno v. Cockrell, 274 F.3d 204, 207 (5th Cir. 2001); see also Smith v. Robbins, 528 U.S. 259, 286 (2000).  Therefore, a petitioner must demonstrate a reasonable probability that, if appellate counsel's performance had not been deficient in the manner claimed, the appellate court would have vacated or reversed the trial court judgment based on the alleged error.  Briseno, 274 F.3d at 210.

### 1.  Trial Counsel

With respect to trial counsel, petitioner claims:

> Mr. Lewis seeks a remedy because inadequate assistance of counsel during this critical stage of the proceedings caused a nonacceptance of a plea offer and further proceeding led to a less favorable outcome.  Here the favorable plea offer was reported to him but, on the advice of counsel was rejected.[27]

An evidentiary hearing was held on this claim by the state district court, which summarized those proceedings as follows:

> On June 22, 2017, the client testified that Emily Voshell, his trial counsel, communicated a plea offer made by the State of Louisiana prior to his trial.  He went on to say that his attorney persuaded him to reject the offer as she was confident of an acquittal.  The matter was then recessed until such time as the court could hear from defense trial counsel.
> On July 21, 2017, the defendant waived his attorney client privilege as to Ms. Voshell, one of his two trial attorneys, but not the other, Don Donelly [sic].

---

[27] Rec. Doc. 1-1, p. 9.

On September 8, 2017, the State produced an affidavit from Ms. Voshell in which she contradicted Mr. Lewis in every significant detail.[28]

Indeed, in her affidavit, Voshell stated:

1.    I am a member of the Louisiana bar and previously served as a public defender in Orleans Parish.

2.    I was assigned, along with Don Donnely [sic], Esq., to represent Jeffery Lewis, who was charged with second degree murder under case no. 494-752.

3.    I do not recall whether or not Mr. Lewis was offered a plea bargain by the State.   Mr. Donnelly was lead counsel and if any plea agreement was negotiated with the State, he would have done the negotiating.   I remember that Mr. Lewis's brother was given a plea offer which he ultimately accepted, and Mr. Lewis may have received an offer as well.

4.    I have no memory of giving any advice to Mr. Lewis regarding any plea agreement.   I was not assigned to the case from the beginning, and advice may have been given before I was on the case, or when I was not present.

5.    I never "promised" or "guaranteed" to Mr. Lewis that he would be acquitted or would otherwise be released from jail immediately after the trial.[29]

Here, petitioner fails to identify the supposed terms of the alleged offer, and he has presented no evidence, other than his own self-serving allegations, establishing that counsel advised him not to accept it.  On the contrary:  petitioner has offered no evidence whatsoever that anyone overheard counsel give him such advice (or that anyone was otherwise aware that such advice was given); Voshell stated that she had no memory of giving such advice; and petitioner even refused to waive his attorney-client privilege to allow any evidence from Donnelly

---

[28] State Rec., Vol. 7 of 9, Judgment dated October 6, 2017.
[29] State Rec., Vol. 7 of 9, affidavit of Emily Voshell.

concerning the matter.[30]  Therefore, petitioner has utterly failed to meet the burden of a proof with

respect to this claim, a burden which is clearly his to bear.  See, e.g., Clark v. Collins, 19 F.3d 959,

964 (5th Cir. 1994) ("Habeas corpus petitioners seeking relief on this basis bear the burden of

demonstrating both of [the Strickland] elements.").  Therefore, relief should be denied.

Lastly, in the heading of the section discussing the foregoing claim, petitioner stated that

"his right to testify was taken away from him."[31]  The Court initially assumed that the foregoing

language was merely inadvertently and erroneously included, given that it did not match the

language used in his immediately preceding "Assignment of Errors" and was not even mentioned

in his subsequent discussion of his claim.  However, petitioner then again referred to this supposed

claim in his reply to the state's response, although, once again, without explanation or discussion.[32]

In any event, to the extent that petitioner is in fact asserting such a claim in this proceeding, it does

not warrant relief.

Regarding such claims, the law is clear:  "[I]t cannot be doubted that a defendant in a

criminal case has the right to take the witness stand and to testify in his or her own defense."  Rock

v. Arkansas, 483 U.S. 44, 49 (1987).  That said, petitioner has not offered any evidence whatsoever

establishing that he wanted to testify at trial or that counsel prohibited him from doing so.  Without

more, his claim simply cannot succeed.  As the United States Seventh Circuit Court of Appeals

noted in a case in which a petitioner alleged that he had been denied the right to testify by his

counsel:

> There is grave practical difficulty in establishing a mechanism that will
> protect a criminal defendant's personal right (that is, a right not waivable by

---

[30] State Rec., Vol. 7 of 9, minute entry dated July 21, 2017
[31] Rec. Doc. 1-1, p. 8.
[32] Rec. Doc. 15, p. 3, ¶ 7.

counsel) to testify on his own behalf without rendering the criminal process unworkable. It is extremely common for criminal defendants not to testify, and there are good reasons for this, as we have seen. Yet it is simple enough after being convicted for the defendant to say, "My lawyer wouldn't let me testify. Therefore I'm entitled to a new trial." ...

... [A] barebones assertion by a defendant, albeit made under oath, is insufficient to require a hearing or other action on his claim that his right to testify in his own defense was denied him. It just is too facile a tactic to be allowed to succeed. Some greater particularity is necessary – and also we think some substantiation is necessary, such as an affidavit from the lawyer who allegedly forbade his client to testify – to give the claim sufficient credibility to warrant a further investment of judicial resources in determining the truth of the claim.

Underwood v. Clark, 939 F.2d 473, 475-76 (7th Cir. 1991); accord Beasley v. Vannoy, Civ. Action No. 19-9925, 2020 WL 974930, at *17 (E.D. La. Jan. 24, 2020), adopted, 2020 WL 972749 (E.D. La. Feb. 28, 2020); Watson v. Vannoy, Civ. Action No. 18-10085, 2019 WL 2619917, at *12 (E.D. La. May 21, 2019), adopted, 2019 WL 2617231 (E.D. La. June 26, 2019); Baker v. Cain, Civ. Action No. 06-2039, 2007 WL 2174959, at *10-11 (E.D. La. July 26, 2007); White v. Cain, Civ. Action No. 06-1576, 2006 WL 3703240, at *4-5 (E.D. La. Dec. 11, 2006).

Further, if petitioner is merely alleging that his counsel was ineffective for failing to call him to testify, that contention likewise has no merit. A decision whether to put a criminal defendant on the stand "is a 'judgment call' which should not easily be condemned with the benefit of hindsight." United States v. Garcia, 762 F.2d 1222, 1226 (5th Cir. 1985); accord United States v. Mullins, 315 F.3d 449, 453 (5th Cir. 2002); Amos v. Cain, Civ. Action No. 04-2029, 2008 WL 782472, at *11 (E.D. La. Mar. 20, 2008); Curtis v. Cain, Civ. Action No. 06-1676, 2008 WL 482849, at *10 (E.D. La. Feb. 13, 2008). Such a matter is inherently one of trial strategy, and federal habeas courts generally are not to second-guess counsel's decisions on matters of trial tactics; rather, courts are to employ a strong presumption that counsel's conduct falls within a wide

range of reasonable assistance and, under the circumstances, might be considered sound trial strategy. Strickland, 466 U.S. at 689.

The instant habeas proceeding is far removed from the context of the actual trial, and this Court has no mechanism available to fairly judge counsel's assessment of his own client at the time and his view of the strength of the prosecution's case as it was presented live. Under these circumstances and in light of the deference that must be accorded to counsel's strategic decisions, the Court declines to second-guess counsel's decision not to put petitioner on the stand.

### 2. Appellate Counsel

As noted, petitioner also claims that his appellate was ineffective, alleging that she "was grossly negligent for failing to raise significant issues that were objected to and preserved for judicial review."[33]

With respect to such claims, it must be remembered that counsel "is not obligated to urge on appeal every nonfrivolous issue that might be raised (not even those requested by defendant)." West v. Johnson, 92 F.3d 1385, 1396 (5th Cir. 1996). Rather, "[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." Jones v. Barnes, 463 U.S. 745, 751-52 (1983). Far from evidencing ineffectiveness, an appellant counsel's restraint often benefits her client because "a brief that raises every colorable issue runs the risk of burying good arguments ... in a verbal mound made up of strong and weak contentions." Id. at 753. As a result, the test to be applied in assessing such a claim is whether the issue ignored by appellate counsel was "clearly stronger" than the issues actually presented on appeal. See, e.g., Diaz v.

---

[33] Rec. Doc. 1-1, p. 10.

<u>Quarterman</u>, 228 F. App'x 417, 427 (5th Cir. 2007); <u>accord</u> <u>Smith v. Robbins</u>, 528 U.S. 259, 288 (2000).

In the instant case, appellate counsel raised three assignments of error on direct appeal: (1) the evidence was insufficient to support the conviction; (2) the trial court erred in denying a defense motion for new trial; and (3) the trial court erred in denying a defense motion in limine seeking to exclude photographs of petitioner and Christopher Lewis holding firearms. Although those claims were ultimately found to be without merit, the claims petitioner now proposes were certainly no stronger, and, therefore, he cannot show he was prejudiced by their omission for the following reasons.

Petitioner identifies four additional claims that he argues should have been presented on appeal: (1) the trial court erred in disallowing testimony that the name "Gabby" was tattooed across the victim's chest;[34] (2) the trial court erred in disallowing evidence that items (which may have been drugs) were found secreted in the victim's "gluteal area";[35] (3) the trial court erred in not allowing the autopsy report to be published to the jury;[36] and (4) the trial court erred in allowing Detective Pardo to testify that, upon arrest, petitioner disclaimed any knowledge of the shooting.[37]

However, the first three of those issues *were* raised on appeal, albeit in a slightly different context. Specifically, appellate counsel argued that the trial court erred in failing to grant the defense motion for a new trial based on numerous allegedly erroneous trial court actions, including, but not limited to, those concerning the tattoo, the secreted items, and the autopsy report. The Court of Appeal denied that claim, and, with respect to those three subparts of the claim, held:

---

[34] Rec. Doc. 1-1, p. 11.
[35] <u>Id.</u>
[36] <u>Id.</u> at p. 12.
[37] <u>Id.</u> at p. 13.

In the fourth subpart of this assignment of error, the defendant cites two erroneous trial court rulings which he claims curtailed his constitutional right to present a defense. The defendant contends that the errors stemmed from the court's refusal to allow the defense to question the coroner concerning a tattoo of the name "Gabby" on the victim's chest and the "apparent" crack cocaine in the decedent's gluteus.

As to the tattoo, the defendant argues that the evidence was needed to show that the victim loved Gabby Lewis and to refute the testimony of the victim's mother that Gabby Lewis had threatened the victim and that the two had been having problems. The defendant argues that "[t]he evidence of the tattoo was relevant in that it made the fact that the victim and Gabby Lewis were in a strong relationship – and thus not one where Gabby would get her brothers to kill [the victim]."

It is extremely unlikely that the court's refusal to allow the defense to raise the issue of the "Gabby" tattoo deprived the defendant of the opportunity to build his defense at trial while allowing the State to build a motive for the killing. While the victim's mother did testify as to non-particularized threats against the victim, she also said that the victim introduced Gabby Lewis to her as his girlfriend and informed her that Gabby was pregnant with his child. Further, the victim's mother said that the victim had lived with the Lewis family, and that she knew the defendant was a friend to the victim. Moreover, Harris, who was present before and after the shooting began, testified that the defendant's warning to the victim to stop messing with Harris prompted the victim to run out of the house "to get his issue," which in turn caused the defendant and Christopher Lewis to arm themselves. There was no evidence that the shooting related in any way to Gabby Lewis; thus, it does not appear that the exclusion of the evidence of the tattoo inhibited the defendant's ability to assert his defense as he consistently maintained his innocence in the shooting death of the victim.

As for the defendant's reference to the "apparent" crack cocaine in the victim's gluteus, there was no evidence that anything was found in the victim's gluteus, let alone cocaine. The coroner, Dr. Tracy, was questioned by defense counsel about the presence of drugs on the body of the victim: "During your examination, upon an examination of the gluteal area, you found a small wad of tissue paper with several pieces of crystal objects inside of it?" Dr. Tracy responded: "I don't remember that detail." Thus, we find that neither of the claims raised by the defendant in this portion of his second assignment of error has merit.

Under the fifth subsection of this assignment of error, the defendant argues that the trial court erred in not allowing a copy of the autopsy protocol into evidence. He asserts that the protocol was important and should have been reviewed by the jury "in order ... to determine the weight to give the tattoo as well as the suspected crack found in a crevice of the [victim's] body." However, as discussed above, the existence of the tattoo does not support the defendant's argument of lack of motive to kill the victim as this shooting had nothing to do with

> Gabby Lewis.  Additionally, his claim of "suspected" crack cocaine being found in the victim's gluteus is a fabrication.[38]

Although the Court of Appeal was addressing whether a new trial was warranted based on those rulings, it is evident that, under the same reasoning, the arguments would have been similarly weak if they had brought in the slightly different context petitioner now proposes, namely as a direct challenge to the trial court's evidentiary rulings.  And, more importantly, there is certainly no reason to believe that the very same court would have reached a different conclusion if only the claims had been asserted in that context.

The fourth proposed claim concerning Pardo's testimony is similarly weak.  At trial, the following exchange occurred during Pardo's testimony on direct examination:

> Q.    Once Jeffery Lewis was placed under arrest for second degree murder, what statement did he make to you?
>
> A.    He made no statements.
>
> Q.    Did he say anything at all?
>
> A.    I believe he stated, "I don't know what you are talking about, I don't know what this is about," or something to that effect, but no statements regarding anything.[39]

Although no objection was made to that testimony at the time, defense counsel subsequently lodged an objection and moved for a mistrial:

> MS. VOSHELL:
>
> Judge, I just have one final thing to put on the record.
> During Detective Pardo's testimony it was elicited that when Mr. Lewis was arrested that he made a statement to the effect of, "I don't know anything about that shooting."

---

[38] State v. Lewis, 125 So. 3d 1252, 1264-65 (La. App. 4th Cir. 2013); State Rec., Vol. 7 of 9.
[39] State Rec., Vol. 3 of 9, transcript of November 30, 2011, p. 36.

This is the first time that the Defense is hearing that statement, the statement has not previously been ruled admissible and, given the facts and circumstances of this case in which a State witness has already testified that Mr. Lewis was at that scene, that he was at that scene during that shooting, that statement can, in fact, be inculpatory and at this time the Defense would be moving for a mistrial based on the admission of that evidence in front of the Jury.

THE COURT:

Your motion is denied.[40]

As an initial matter, the Court notes that Voshell misstated (as petitioner also does now) Pardo's testimony concerning petitioner's vague, explained comment. They contend that petitioner's comment disclaimed any knowledge of *the shooting*; however, the comment did not expressly reference the shooting. Further, a more reasonable interpretation of the comment is that petitioner was simply expressing consternation or confusion as to why he was being arrested at all.

Nevertheless, in any event, that distinction is not material. Whether the comment is interpreted as one in which petitioner was disclaiming knowledge of the shooting or as one in which he was simply questioning the basis for his arrest, under neither interpretation is the comment inherently inculpatory. Given the limited nature of the passing, unexplained reference to the comment, it was insufficient to pose a legitimate concern (perhaps explaining why no objection to the testimony was lodged contemporaneously), and it certainly was not so egregious as to warrant Voshell's request for a mistrial under Louisiana law. See La. Code Crim. Proc. arts. 770, 771, and 775 (concerning grounds for mistrial). Accordingly, there is no basis for this Court to say that this proposed claim was "clearly stronger" than the three claims counsel asserted on appeal.

---

[40] Id. at pp. 103-04.

Lastly, the Court notes that petitioner's discussion of his ineffective assistance of appellate counsel claim concludes with the following sentence:  "The racial discrimination issue appellate counsel failed to raise and brief on Mr. Lewis direct appeal."[41]  However, he provides no context for or explanation of that allegation – and the Court has no idea what "racial discrimination issue" petitioner is referencing.  Obviously, without more, the Court, once again, simply has no basis for concluding that the "racial discrimination issue," whatever it it may have been, was "clearly stronger" than the three claims counsel asserted on appeal.

In summary, to be entitled to relief, petitioner must demonstrate that the state court decision rejecting his ineffective assistance of trial and appellate counsel claims was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  He has not made that showing in the instant case.  Accordingly, utilizing the AEDPA's doubly deferential standards of review applicable to such claims, this Court should likewise deny relief.

## **RECOMMENDATION**

It is therefore **RECOMMENDED** that federal application for habeas corpus relief filed by Jeffrey Lewis be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will

---

[41] Rec. Doc. 1-1, p. 14.

result from a failure to object.  28 U.S.C. § 636(b)(1); <u>Douglass v. United Services Auto. Ass'n</u>,

79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[42]

New Orleans, Louisiana, this ___1st___ day of June, 2020.


**JANIS VAN MEERVELD**
**UNITED STATES MAGISTRATE JUDGE**

---

[42] <u>Douglass</u> referenced the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.